*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0105p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

<table>
<tr><td>

JENNIFER A. DURAND, on behalf of herself
and all others similarly situated,

*Plaintiff-Appellant,*

*v.*

THE HANOVER INSURANCE GROUP, INC. and
THE ALLMERICA FINANCIAL CASH BALANCE
PENSION PLAN,

*Defendants-Appellees.*

</td><td>

No. 07-6468

</td></tr>
</table>

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 07-00130—Charles R. Simpson III, District Judge.

Argued: October 28, 2008

Decided and Filed: March 18, 2009

Before: NORRIS, ROGERS, and KETHLEDGE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Eli Gottesdiener, GOTTESDIENER LAW FIRM, Brooklyn, New York, for Appellant. Alan S. Gilbert, SONNENSCHEIN, NATH & ROSENTHAL, Chicago, Illinois, for Appellees. **ON BRIEF:** Eli Gottesdiener, GOTTESDIENER LAW FIRM, Brooklyn, New York, E. Douglas Richards, E. DOUGLAS RICHARDS, Lexington, Kentucky, for Appellant. Alan S. Gilbert, SONNENSCHEIN, NATH & ROSENTHAL, Chicago, Illinois, Richard H.C. Clay, Angela Logan Edwards, Lisa H. Thomas, WOODWARD, HOBSON & FULTON, Louisville, Kentucky, for Appellees.

_____

**OPINION**

_____

KETHLEDGE, Circuit Judge. Plaintiff Jennifer A. Durand appeals the district court's dismissal of her complaint filed under the Employee Retirement Income Security Act

of 1974, 29 U.S.C. § 1001 *et seq.* (ERISA).  The district court held that Durand had failed to exhaust her administrative remedies.  We conclude that exhaustion of those remedies would have been futile, and reverse.

I.

A.

Durand's complaint challenges the legality of Defendants' methodology for calculating lump-sum distributions pursuant to their defined-benefit pension plan.  "Under a defined benefit plan, an employee's benefit is an amount, either in the form of an annuity or a lump-sum payment, equal to a specified percentage of the employee's salary in the final years of his or her employment."  *West v. AK Steel Corp.*, 484 F.3d 395, 399 (6th Cir. 2007).

The plan at issue here—the Allmerica Financial Cash Balance Pension Plan (the "Allmerica Plan" or "Plan")—belongs to a subset of defined-benefit plans, known as "cash-balance" plans.  *See* ERISA § 3(35), 29 U.S.C. § 1002(35).  A "cash-balance plan creates an account for each participant," but "the account is hypothetical and created only for recordkeeping purposes."  *AK Steel*, 484 F.3d at 399.  "The hypothetical account on paper looks much like a traditional 401(k) account."  *Id.*  Each participant's account is funded by hypothetical allocations, called "pay credits," and hypothetical earnings, called "interest credits," that "are determined under a formula selected by the employer and set forth in the plan."  I.R.S. Notice 96-8, 1996-1 C.B. 359.

This case is about interest credits.  Interest credits "may be fixed or variable[.]"  *AK Steel*, 484 F.3d at 399.  Of importance here, "[e]ven if the employee ceases working for the plan sponsor, interest credits continue to accrue to the employee's hypothetical account until he or she begins receiving pension benefits.  When an employee reaches the normal retirement age of 65, the pension benefit is the value of this hypothetical account balance."  *Id.*  That value is known as the normal "accrued benefit."  ERISA § 3(23)(A), 29 U.S.C. § 1002(23)(A).

An employee who leaves the plan sponsor "can usually choose whether the benefit is distributed in the form of a single-life annuity[,]" pursuant to which payments begin when the departing employee reaches retirement age, or a "lump-sum" distribution, made at the

time of the employee's departure.  *AK Steel*, 484 F.3d at 399.  A departing employee cannot be penalized for choosing the lump-sum distribution; thus, "[t]o comply with ERISA, lump-sum payments such as the one[] received by the plaintiff[] in the present case must be the *actuarial equivalent of the normal accrued pension benefit*."  *Id*. at 400 (emphasis added).

For distributions made prior to 2006, determining this actuarial equivalent required a two-step "whipsaw" calculation.[1]  First, the participant's account balance was projected forward to its value at the participant's normal retirement age, "*using the rate at which future interest credits would have accrued*" had the participant remained in the plan.  *Id*. (emphasis added).  Second, "that projected amount [was] discounted back to its present value on the date of the actual lump-sum distribution."  *Id*.

Critically for our purposes here, the projection forward must have "'include[d] a *fair estimate*'" of what the participant's future interest credits *actually would have been* had she retained a single-life annuity under the plan.  *Id*. at 408 (quoting *Berger v. Xerox Corp. Ret. Income Guar. Plan*, 338 F.3d 755, 761 (7th Cir. 2003)) (emphasis added).  The "fair estimate" is critical because, if the participant's future interest rate exceeds the discount rate, the participant's lump-sum distribution will be greater than her hypothetical account balance at the time of the distribution.  *AK Steel*, 484 F.3d at 401.

### B.

That "fair estimate" is precisely what Durand contends the Plan's methodology did not include.  Under the Plan, participants selected investment options from a 401(k)-style menu.  The market rate of return on the options selected determined the participant's interest credits; and those credits thus varied among participants.

But the Plan did not attempt to make individualized estimates of departing participants' future interest credits.  Instead, the Plan used a uniform projection rate—the 30-Year Treasury Bill rate—in performing every such participant's whipsaw calculation.

---

[1]The Pension Protection Act of 2006 effectively relieves cash-balance plans of the need to make this calculation for lump-sum distributions made after its effective date.  *AK Steel*, 484 F.3d at 401-02.  The distribution at issue here, however, was made in 2003.

The Plan then used that same rate to discount the projected balances back to their present values.  The result in every case was a wash:  as in *AK Steel*, "the lump-sum payout would always equal the participant's hypothetical account balance at the time of distribution."  *Id.* at 406.

This aspect of the Plan did not pass unnoticed.  In March 2002, the Department of Labor examined the lump-sum calculation methodologies of several cash-balance plans, and specifically concluded that, given the variable nature of interest credits under the Allmerica Plan, the Plan's use of a uniform projection rate violated ERISA.  *See* Complaint ¶¶21-22.  In response, the Plan issued a press release stating that "[w]e are very confident that we have been calculating benefits in accordance with the terms of the plan and in accordance with applicable laws and regulations[.]"  *See id*. Ex. 4.  Meanwhile, during the years 2000-03, three circuit courts—the Second, Seventh, and Eleventh—held that a departing participant's future interest credits must be included in determining the amount of any lump-sum distribution for the participant.  *See AK Steel*, 484 F.3d at 406-08 (discussing cases).  No circuit court has ever held the contrary.  At no time relevant to Durand's claim, however, did the Plan or its administrators depart from the Plan's stated methodology for calculating lump-sum distributions.

C.

Jennifer Durand worked for the First Allmerica Financial Life Insurance Company (the "Company"), a subsidiary of Defendant The Hanover Insurance Group, Inc. ("Hanover"), from October 1995 to April 2003.  When Durand left the Company at age 32, she elected to take her pension benefit in the form of a lump-sum distribution.  Her hypothetical account balance on the date of her distribution was $17,038.18.  Pursuant to the Plan's terms, its administrators projected her balance forward using the 30-Year Treasury Bill rate, and then discounted the projected amount back to its present value using that same rate.  The calculation was thus a wash; and, in August 2003, the Allmerica Plan paid Durand $17,038.18.

On March 9, 2007, Durand filed a putative class-action complaint against Hanover and the Allmerica Plan, alleging that the Plan's methodology for calculating

lump-sum distributions violated ERISA.  Defendants moved to dismiss on exhaustion grounds, arguing that Durand should have first presented her claim to the Plan's administrators.  The district court agreed, and granted the motion.

This appeal followed.

II.

We review the district court's application of the administrative-exhaustion requirement in an ERISA case for abuse of discretion.  *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 418 (6th Cir. 1998).  However, "a court is obliged to exercise its discretion to excuse nonexhaustion where resorting to the plan's administrative procedure would simply be futile or the remedy inadequate."  *Id.* at 419.

We routinely enforce the exhaustion requirement when an ERISA plaintiff contends that his benefits were improperly calculated under the terms of a plan.  *See, e.g.*, *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 90-91 (6th Cir. 1997).  ERISA plans are often complicated things, and the question whether a plan's methodology was properly applied in a particular case is usually one best left to the plan administrator in the first instance.  Administrators, not courts, are the experts in plan administration.

But the same is not true of an across-the-board challenge to the *legality* of a plan's methodology.  In those cases, the claimant typically concedes that her benefit was properly calculated under the terms of the plan as written, but argues that the plan itself is illegal in some respect.  *See, e.g.*, *AK Steel*, 484 F.3d at 404-05.  And *that* question—legality—is one within the expertise of the courts.  Sending such a claimant back to the administrative process, to recalculate a benefit she concedes was already properly calculated under the terms of the plan as written, misses the point of the dispute.  In that situation, exhaustion wastes resources rather than conserves them.  Consequently, we have held that, in an ERISA case, when the plaintiff's "suit [i]s directed to the *legality* of [a plan], not to a mere *interpretation* of it[,]" exhaustion of the plan's administrative remedies would be futile.  *Costantino v. TRW, Inc.*, 13 F.3d 969, 975 (6th Cir. 1994) (emphasis in original).

This case is governed by that simple rule. Durand has no quarrel with Allmerica's calculation of her lump-sum distribution under the terms of the Plan as written; instead, her claim is that the Plan's methodology for calculating such distributions is illegal. *See* Complaint ¶22 ("the Plan violates ERISA in the *way* it calculates lump sum distributions") (emphasis added). Her claim is thus directed to the Plan's legality; and forcing her to resort to her administrative remedies, rather than her legal ones, would be futile.

We do recognize that, in the somewhat different context of judicial review of government-agency action, exhaustion is not excused merely because the outcome of the administrative-review process is very predictable. Where there is an exhaustion requirement for claims in which an administrative agency has experience and expertise, or delegated discretion, the courts must allow the administrative process to take its course even when the outcome will almost certainly be adverse to the claimant. *See McKart v. United States*, 395 U.S. 185, 193-94, 198 n. 16 (1969); *McGee v. United States*, 402 U.S. 479, 484 (1971); *McCarthy v. Madigan*, 503 U.S. 140, 144-46 (1992). However, in this case, Allmerica is not a government agency but a regulated body under ERISA; it has neither discretion to determine the legality of its own Plan nor special expertise in interpreting the statute. Allowing the administrative process to go forward would thus do little to vindicate the purposes of the exhaustion requirement.

This case instead follows in the footsteps of *AK Steel*. There, as here, the plaintiff, West, took a lump-sum distribution from a cash-balance plan upon leaving the sponsoring employer. And there, as here, under the terms of the plan, the amount of the distribution was equal to the participant's account balance. Like Durand, West challenged the legality of the plan's methodology for calculating his lump-sum distribution, rather than the accuracy of the calculation itself. Unlike Durand, West submitted an administrative claim concerning his distribution. But the claim was untimely—it was filed nearly three years late—and thus, under the terms of the plan, we treated West as if he had not filed an administrative claim at all. *See* 484 F.3d at 404.

The case presented, therefore, the question whether exhaustion of West's administrative remedies would have been futile.

The answer to that question, in both this court and the district court, was yes. West's claim was that "the provisions of the AK Steel Plan violate ERISA and the Internal Revenue Code[,]" *id.*, not that the plan administrator misapplied the plan in calculating his distribution. And "West ha[d] already received an amount equal to his account balances, which is all that he [was] entitled to under AK Steel's interpretation of its Plan." *Id.* at 405. Thus, as the district court in that case held, "no amount of administrative review would alter the calculation of benefits under the current terms of the plan." *Id.* at 404. We therefore agreed with the district court that "[e]xhaustion here would have been futile[.]" *Id.* at 405.

The same considerations are present here: Durand challenges the Plan's legality; she has already received an amount equal to her account balance; and no amount of administrative review would alter the calculation of her benefits under the methodology set forth in the Plan. The question for Allmerica, then, is why our binding precedent in *AK Steel* should not govern here.

Allmerica offers many suggested answers to that question. Allmerica first argues—and the district court in this case held—that *AK Steel* is distinguishable because West, unlike Durand, filed an administrative claim. But that distinction is illusory. The AK Steel plan provided—in a section whose legality was not disputed in that case—that a "'claimant who does not submit a written claim or request for review *within the time limitations specified* [in the plan] shall be deemed to have waived and abandoned any such claim[.]'" *Id.* at 404 (emphasis added). Thus, as noted above, we treated West as if he had not filed an administrative claim at all. That indeed is the *reason* why we decided the exhaustion issue in *AK Steel*. So the case cannot be distinguished on the ground of West's untimely claim.

Allmerica next argues that *AK Steel* is inapposite because there the future interest credits accrued at a fixed rate, whereas here they were variable. But this argument has little to do with the exhaustion issue. The argument instead concerns the merits question

whether this plan, like the one in *AK Steel*, violates ERISA, an issue we do not address on this appeal.

The same is true of Allmerica's next argument. Allmerica says that—unlike the AK Steel plan, which stated expressly that a departing participant's lump-sum distribution was equal to her account balance—the Allmerica Plan "provides for a whipsaw calculation" to determine the amount of such distributions. Allmerica Br. at 37. But if that is the putative distinction between the cases, *AK Steel* is binding indeed. The Allmerica Plan merely went through the motions of a whipsaw calculation, since it is undisputed that the Plan projected out and discounted back at precisely the same rate. The whole exercise, by design, always ended up exactly where it started: the departing participant received her account balance. The only difference between the plans in this respect is that the AK Steel plan said as much directly.

Allmerica also argues that, if construed to support Durand's futility argument, *AK Steel* would "eviscerate[] this Court's long-standing requirement that pension plan participants first exhaust administrative remedies before bringing benefit claims to court, because most benefit claims challenge the legality of plan actions." Allmerica Br. at 33. But this argument states the issue at the wrong level of generality. Challenges to "plan *actions*" include challenges to the mere *calculation* of a participant's benefits under a plan. Excusing exhaustion for those claims, as a matter of course, certainly would leave a large hole in the doctrine. But that is not the claim that Durand makes here. What she challenges is the legality of the Plan *itself*; and a decision to allow *that* claim to proceed would not "eviscerate" anything. Rather, it amounts merely to a straightforward application of our holdings in both *Costantino* and *AK Steel*.

Allmerica next attempts to treat Durand's legality challenge as if it were really a calculation challenge. Specifically, Allmerica argues that the Plan's methodology is not "*per se* illegal as to all plan participants," because using the 30-Year Treasury Bill projection rate might happen to result in a calculation that conforms to ERISA in a particular participant's case. And determining whether that occurred in Durand's case,

Allmerica says, is an issue that the Plan Administrator should have the "first opportunity" to determine. *Id.* at 27.

This argument—like an analogous one that we rejected in *Fallick*—"seriously mischaracterize[s] the gravamen of" Durand's claim. 162 F.3d at 419. Her claim, just like the claim in *AK Steel,* is that "[t]he Plan's *terms . . .* did not comply with the law." 484 F.3d at 409 (emphasis added). And Durand is entitled to make that claim—that the Plan's *terms* did not comply with the law—without having it first converted into an administrative dispute about whether the amount of her distribution was correct. Allmerica cannot "miscast this action as one primarily for a claim-by-claim" miscalculation of benefits, when Durand "challenge[s the Plan's] across-the-board application of a *methodology*" that she alleges is unlawful. *Fallick*, 162 F.3d at 420 (internal quotation marks omitted; emphasis added).

Allmerica also presents a false dilemma. Adjudication of Durand's claim need not put the district court on a path that ends with the court itself trying to estimate what her future interest credits would have been. Rather, if the district court determines that the Plan's methodology violates ERISA, the court could simply award injunctive relief that requires Allmerica, in the first instance, to do what the law requires. That would not only develop the record, as desired by the district court; it would also give Allmerica the "first opportunity" for which it argues at length in its brief.

Only one argument of significance remains. Section 401(a)(1)(D) of ERISA, 29 U.S.C. § 1104(a)(1)(D), provides that plan fiduciaries—of which the plan administrator is one—shall act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with" ERISA. *See also* Allmerica Plan § 13.02(iv) (same). Based upon these provisions, Allmerica argues that, if Durand were now to present an administrative claim, and if she is indeed correct in claiming that the Plan's methodology is unlawful, "the Plan administrators can use another projection method" to recalculate her lump-sum distribution. Allmerica Br. at 29.

As an initial matter, the cited provisions read more like a limitation on fiduciary power than an augmentation of it. But Allmerica's argument is self-defeating even on its own terms. The Plan administrators lack any power to amend the Plan; only the Employer can do that. *See* Allmerica Plan § 16.01. The administrators' authority to disregard unlawful Plan provisions, therefore, can only be derived from their own duty to comply with the law. That duty does not await the filing of administrative claims, but has been there all along. And at no point have the administrators done anything other than apply the methodology set forth in the Plan itself. Thus, as one district court recently observed in rejecting this same argument, "since [the administrators] did not alter the formula, they [must] implicitly conclude that the Plan['s] method of calculation is not illegal." *Thompson v. Ret. Plan for Employees of S.C. Johnson & Sons, Inc.*, No. 07-1047, 2008 WL 4964714 at *6 (E.D.Wis. Nov. 14, 2008). The administrators' actions, in this respect, speak louder than their counsel's words on appeal.

But the administrators' words also confirm the point. The Complaint alleges, and Allmerica does not dispute, that a March 2002 report (prepared for internal, rather than enforcement, purposes) by the United States Department of Labor Inspector General, specifically found that the Allmerica Plan's methodology for calculating lump-sum distributions violated ERISA in the manner that Durand now alleges in her Complaint. *See* Complaint ¶¶21-22. In response to the report, a Plan spokesperson stated in May 2002 that "[w]e are *very confident* that we have been calculating benefits in accordance with the terms of the plan *and in accordance with applicable laws and regulations*[.]" *See id.* Ex. 4 (emphasis added).

At no point have the Plan administrators retracted this statement, or intimated even the slightest erosion of the "confiden[ce]" expressed therein. That is true notwithstanding that, in the meantime, four circuit courts, including this one, have held that plans similar to Allmerica's Plan—not necessarily in every material respect, but certainly in some—violate ERISA. That is not to say the administrators *should* have changed their position in light of those holdings; they, too, are entitled to their day in

court.  But it does mean there is no reason to think the filing of an administrative claim by Jennifer Durand would cause them to change their position in the least.

Futility, in conclusion, is a practical doctrine.  And the practical reality is that administrative review of Durand's claim would only delay its resolution, if not send the claim off a cliff altogether.[2] Administrative review of Durand's claim would be futile; and litigation of its merits should proceed without delay.

The district court's November 7, 2007 memorandum opinion and order are reversed, and the case remanded for proceedings consistent with this opinion.

---

[2] Although we do not rely on the point, it appears that the filing deadline for any administrative claim concerning Durand's 2003 distribution has long-since passed.  *See* Allmerica Plan §§ 15.06-.07.