RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0271p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JENNIFER DURAND,

*Plaintiff,*

WALTER J. WHARTON; MICHAEL A. TEDESCO,

*Plaintiffs-Appellants,*

*v.*

THE HANOVER INSURANCE GROUP, INC.; THE ALLMERICA FINANCIAL CASH BALANCE PENSION PLAN,

*Defendants-Appellees.*

No. 14-5648

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:07-cv-00130—James D. Moyer, Magistrate Judge.

Argued: June 11, 2015

Decided and Filed: November 6, 2015

Before: KEITH and CLAY, Circuit Judges; MARBLEY, District Judge.[*]

_____

### COUNSEL

**ARGUED:** Eli Gottesdiener, GOTTESDIENER LAW FIRM, PLLC, Brooklyn, New York, for Appellants. Alan S. Gilbert, DENTONS US LLP, Chicago, Illinois, for Appellees. **ON BRIEF:** Eli Gottesdiener, GOTTESDIENER LAW FIRM, PLLC, Brooklyn, New York, for Appellants. Alan S. Gilbert, DENTONS US LLP, Chicago, Illinois, for Appellees.

_____

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

1

---

**OPINION**

---

CLAY, Circuit Judge.  Named Plaintiffs Walter Wharton and Michael Tedesco appeal the dismissal of their claims from this class action suit filed under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA").  The magistrate judge, presiding over the case with the consent of the parties, held that Wharton's and Tedesco's "cutback" claims were time-barred and did not relate back to the "whipsaw" claim asserted in the original class complaint in March 2007.  For the reasons that follow, we **AFFIRM** the judgment of the district court.

**BACKGROUND**

**A.  Procedural Background**

On March 3, 2007, lead Plaintiff Jennifer Durand filed the complaint initiating this ERISA class action against her former employer, The Hanover Insurance Group, Inc. (the "Company"), and the pension plan it sponsors, Allmerica Financial Cash Balance Pension Plan (the "Plan" or the "Allmerica Plan").  The complaint challenged the projection rate used by the Plan to calculate the lump-sum payment Durand elected to receive after ending her employment at the Company in 2003.  At the time Durand elected to receive her lump-sum payment, the Plan used a 401(k)-style investment menu to determine the interest earned by members' hypothetical accounts.  Durand alleged that Defendants impermissibly used the 30-year Treasury bond rate instead of the projected rate of return on her investment selections in the "whipsaw" calculation required under pre-2006 law (discussed in more detail below), in violation of 29 U.S.C. §§ 1053(e) and 1055(g) (ERISA §§ 203(e) and 205(g)).

The district court dismissed Durand's complaint on November 9, 2007 based on her failure to exhaust administrative remedies.  Another panel of this Court reversed, holding that the exhaustion requirement should be excused as futile where an employee challenges the legality of a plan's methodology for calculating benefits, as opposed to the accuracy of the calculation. *Durand v. Hanover Ins. Grp., Inc.*, 560 F.3d 436, 439-40 (6th Cir. 2009) ("*Durand I*").

The case was remanded and litigation proceeded below. Defendants answered the complaint and raised a number of defenses. Relevant to this appeal is the seventh defense, which asserted that the claims of putative class members "who received lump-sum distributions after December 31, 2003" were barred due to an amendment to the Plan that took effect after that date (the "2004 Amendment"). The 2004 Amendment changed the interest crediting formula from the 401(k)-style investment menu to a uniform 30-year Treasury bond rate.

This was not the first time the 2004 Amendment had been raised in the case. Defendants first introduced it as an exhibit to their motion to dismiss in June 2007 as part of their opposition to Durand's claim for prospective equitable relief. At that time, class counsel responded that the 2004 Amendment was "clearly outside the ambit of this Complaint." (R. 13, Response, PageID 287 n.9.) In December 2009, after Defendants raised the amendment as an affirmative defense, class counsel took a different tack and sought to respond by filing an amended complaint with two additional named plaintiffs, Walter Wharton and Michael Tedesco, to assert on behalf of putative subclasses that the 2004 Amendment was an illegal reduction or "cutback" in benefits in violation of 29 U.S.C. § 1054(g) (ERISA § 204(g)). Wharton, who received a lump-sum distribution in 2005 after ending his employment with the Company, also asserted a whipsaw claim on behalf of a putative subclass challenging the whipsaw calculation applied to derive his payment. Wharton's whipsaw claim in effect tested the validity of Defendants' position that the 2004 Amendment barred whipsaw claims for those receiving lump-sum payments after January 1, 2004. The amended complaint also asserted breach of fiduciary duty claims based on Defendants' failure to disclose certain information related to the Plan.[1]

On May 31, 2011, the magistrate judge dismissed the cutback claim asserted by Wharton and Tedesco and the breach of fiduciary duty claims as untimely. On Plaintiffs' motion for reconsideration, the magistrate judge reinstated the breach of fiduciary claims solely as they related to the whipsaw calculation. Separately, the parties litigated the merits of Wharton's whipsaw claim by means of Defendants' motion for summary judgment. The magistrate judge held that the 2004 Amendment validly governed lump-sum distributions occurring after 2003,

---

[1]In addition to these claims, the amended complaint asserted a claim that after the 2004 Amendment, the Plan should have credited members' accounts with the "greater of" the returns on their investment balances or the 30-year Treasury bond rate. Plaintiffs have not challenged the dismissal of this claim on appeal.

and that Wharton was not entitled to a higher interest crediting rate for any portion of his accrued benefits in the whipsaw calculation.

Plaintiffs obtained certification of these judgments as a final order under Rule 54(b) of the Federal Rules of Civil Procedure. In this timely appeal, Plaintiffs challenge the dismissal of the cutback claims and breach of fiduciary duty claims related to the 2004 Amendment. Plaintiffs have abandoned the whipsaw claims of Wharton and the class members he sought to represent.

**B. Plaintiffs' Claims and Relevant Plan Provisions**

Since 1995, Defendant Hanover Institute has provided a "cash balance" defined-benefit pension plan for its employees. *Durand I*, 560 F.3d at 437; *see also West v. AK Steel Corp.*, 484 F.3d 395, 399 (6th Cir. 2007) (discussing cash balance plans); I.R.S. Notice 96-8, Cash Balance Pension Plans, 1996-1 C.B. 359, 1996 WL 17901 (I.R.S. 1996) (same). As described by this Court in *Durand I*,

> [a] cash-balance plan creates an account for each participant, but the account is hypothetical and created only for recordkeeping purposes. The hypothetical account on paper looks much like a tradition[al] 401(k) account. Each participant's account is funded by hypothetical allocations, called "pay credits" and hypothetical earnings, called "interest credits," that are determined under a formula selected by the employer and set forth in the plan.

560 F.3d at 437 (citations and quotation marks omitted). Interest credits, which are at issue in this case, are the earnings attributable to the account balance over time. *AK Steel*, 484 F.3d at 399. The formula for calculating interest credits may provide for a fixed rate of return on the account balances, or it may use a variable rate tied to an identified index. *Id.*

From 1995 until early 1997, the Plan provided a fixed rate of return of six percent. Then, from 1997 until the 2004 Amendment, the Plan allowed members to select hypothetical investment options from a "broadly diversified menu" described in Plan documents, including "an Allmerica stock fund and a wide variety of domestic and international equity funds, corporate and United States government bond funds, and a fixed interest fund and money market fund." (R. 46, Amended Complaint, PageID 623.) Each member's interest credits were calculated based on the actual performance of the investment options he or she had selected. As

mentioned above, the 2004 Amendment eliminated the menu of investment options and provided that all interest credits would be indexed to the 30-year Treasury bond rate.

### 1. The 2007 Complaint: Durand's Whipsaw Claim

The original complaint filed in 2007 focused on the treatment of interest credits in a particular context—the calculation of lump-sum distributions. Employees who leave their employment with the Company may choose either to continue participation in the Plan, in which case they will receive an annuity based on their accrued benefits once they reach the retirement age of 65, or to cash out their benefits and receive a lump-sum. *Durand I*, 560 F.3d at 437-38. As *Durand I* explained, a departing employee "cannot be penalized for choosing the lump-sum distribution; thus, '[t]o comply with ERISA, lump-sum payments such as the one[ ] received by the plaintiff[ ] in the present case must be the *actuarial equivalent of the normal accrued pension benefit*.'" *Id.* at 438 (quoting *AK Steel*, 484 F.3d at 400) (alterations and emphasis in original).

In order to derive the proper amount of the lump-sum distribution, cash balance plans were required until 2006 to use a two-part "whipsaw" calculation. *Id.* "First, the participant's account balance was projected forward to its value at the participant's normal retirement age, using the rate at which future interest credits would have accrued had the participant remained in the plan." *Id.* (quotation marks and emphasis omitted). This projected value yielded an estimation of the value of the participant's accrued benefit when she reached retirement age— here, 65 years of age. "Second, that projected amount was discounted back to its present value on the date of the actual lump-sum distribution." *Id.* (editing and quotation marks omitted). The Pension Protection Act of 2006, Pub.L. No. 109-280, 120 Stat. 780 (2006) eliminated the whipsaw requirement for lump-sum distributions made after August 17, 2006, permitting plans to rely directly on the balance of a hypothetical account to express the value of the accrued benefit. *AK Steel*, 484 F.3d at 401-02; Pub.L. No 109-280, § 701(a) (2006).

Jennifer Durand worked for the Company from 1995 until 2003, participating in the Plan for a total of seven and one half years. After ending her employment with the Company at the age of 32, she elected in 2003 to request the pay-out of her vested benefits in the form of a lump-sum distribution. The 2007 complaint alleged that the lump-sum she received understated the present value of her accrued benefit because it applied a reduced rate for projecting interest

credits.   Rather than using the projected performance of the investment options Durand had individually selected from the 401(k)-style menu, the Plan applied "a uniform projection rate— the 30–Year Treasury [bond] rate." *Durand I*, 560 F.3d at 438.  The 30-year Treasury bond rate was also applied to discount the projected amount of her benefit at normal retirement age back to its present value in 2003, nullifying the effect of the projection-forward.  *Id.*  ("The result in every case was a wash: . . . the lump-sum payout would always equal the participant's hypothetical account balance at the time of distribution." (citation and quotation marks omitted)).  Thus, the lump-sum amount Durand received was $17,038.18, identical to the amount in her hypothetical account at the time.  *Id.* at 439.

The whipsaw methodology employed by Defendants was criticized in a 2002 report by the Inspector General ("IG") of the Department of Labor.  Inspector General, Dept. of Labor, *PWBA Needs to Improve Oversight of Cash Balance Plan Lump Sum Distributions*, Report No. 09-02-001-12-121 (March 29, 2002).   The report surveyed a set of cash balance plans and concluded that some of the plans illegally applied a projection rate lower than the rate used to calculate interest credits for continuing plan participants, then used that same lower rate to discount back to present value, resulting in a projected value equal to the account balance.  (*Id.* at 10-11.)   Defendants acknowledged that the Plan was among those found by the IG to have violated ERISA.   The Plan did not change its calculation methods, but instead publicly announced, "[w]e are very confident that we have been calculating benefits in accordance with the terms of the plan and in accordance with applicable laws and regulations."   (R. 1-5, Complaint Exhibit 4, PageID 20.)

The 2007 complaint squarely focused on the lump-sum calculation and asserted only a "whipsaw" claim under 29 U.S.C. §§ 1053(a), (e) and 1055(g), 26 U.S.C. §§ 411(a) and 417(e). A whipsaw claim alleges that a departing employee's lump-sum distribution understates the present value of her accrued benefit because of the use of a calculation methodology—in this case, a projection rate—that violates ERISA requirements.  *See generally AK Steel*, 484 F.3d at 395.  While the complaint broadly defined the class to include all participants "who vested or will vest in an accrued benefit under the Plan's cash balance formula between January 1, 1995 and December 31, 2004" (R. 1 at 12), other allegations made clear that class membership was

also defined by receipt of a lump-sum distribution pursuant to Defendants' whipsaw methodology (*see id.* at 13-14). For example, the complaint alleged that class members shared common questions of fact because "[t]he computation of a participant's lump sum distribution and the amount of the lump sum distributions is standardized in that the amount of the lump sum distribution for each member of the Class was calculated in the same manner as described above." (*Id.* at 13.) Additionally, the complaint asserted common questions of law "as to each Class member, *i.e.*, whether the method of calculating the lump-sum distributions violated the law." (*Id.*) In alleging typicality, the complaint stated that Durand "does not assert any claims relating to the Plan in addition to or different than those of the class," but that her claims are typical "in that her lump-sum distribution was calculated in the same fashion as the rest of the class." (*Id.*) The complaint did not allege or allude to any violations of ERISA other than the improper whipsaw calculation.

### 2. The First Amended Complaint: Claims Related to the 2004 Amendment

The amended complaint, filed in December 2009, added Wharton and Tedesco as named plaintiffs representing putative sub-classes in asserting new claims challenging the legality of the 2004 Amendment.

Walter Wharton was employed with the Company from 2001 to 2005. During that time he participated in the Plan. After leaving his employment in 2005, Wharton elected to receive a lump-sum distribution of his accrued benefit, and was given a payment of $10,297.45 on May 1, 2005. Like Durand's lump-sum distribution, this amount was identical to the amount reflected in Wharton's hypothetical cash account balance. Wharton seeks to represent a putative sub-class of plan participants who received lump-sum distributions between January 1, 2004, *i.e.*, the date the 2004 Amendment took effect, and August 17, 2006, the date on which the Pension Protection Act eliminated the requirement of a whipsaw calculation (the "2004-2006 Distribution Sub-Class").

Michael Tedesco was employed with the Company from 1993 to 1999 and accrued retirement benefits under the Plan during that period. Tedesco has elected to remain in the Plan rather than to receive a lump-sum distribution, and still has a hypothetical account balance under the Plan. Tedesco seeks to represent a putative sub-class of plan participants who received a

lump-sum or other distribution after August 17, 2006, or who will do so in the future (the "Post-2006 Distribution Sub-Class").

In their cutback claims, Wharton and Tedesco claim that the 2004 Amendment illegally reduced the benefits they had accrued prior to 2004 by eliminating the more valuable 401(k)-style indexing rate governing interest credits and replacing it with a uniform 30-year Treasury bond rate, in violation of 29 U.S.C. § 1054(g) and 26 U.S.C. § 411(d)(6). Based on the proposition that participants had a vested right to the investment-based indexing rate for pre-2004 balances, *see* Notice 96-8, *Cash Balance Plans*, 1996 WL 17901, III.A (I.R.S. 1996), the amended complaint alleges that the 2004 Amendment impermissibly reduced accrued benefits in applying the 30-year Treasury bond rate to a participant's entire hypothetical account balance, rather than solely paying credits allocated after the 2004 Amendment took effect.

### 3.  The First Amended Complaint: Breach of Fiduciary Duty

The amended complaint also asserted claims on behalf of all putative class members that Defendants had breached their fiduciary duty to plan members in their administration of the Plan. The amended complaint identified two categories of breach. First, Plaintiffs alleged that Defendants breached their fiduciary duty by interpreting and applying Plan provisions "without independently assessing whether the account balance and accrued benefit calculation provisions of the Plan complied with ERISA." (R. 46, First Amended Complaint, PageID 645, citing ERISA §§ 404(a)(1).) Second, the amended complaint alleged in general terms that "[i]n communication with participants regarding the Plan and their Plan benefits, both Defendants made material misstatements and omissions regarding the nature and manner in which they interpreted and applied the account balance and accrued benefit calculation provisions of the Plan and SPD." (*Id.* at 646.) As examples of this inadequate communication, the complaint alleged that the Summary Plan Descriptions "failed to accurately or completely apprise participants" of the methodology for calculating lump-sums because Defendants did not disclose the whipsaw calculation, the rates it used, or the reason those rates were selected, and that relatedly, Defendants "failed to disclose the 'loss of benefits'" that occurred as a result of the lower interest rates used in the whipsaw calculation. (*Id.* at 647.)

**DISCUSSION**

***Standard of Review***

We apply *de novo* review to a ruling dismissing claims as barred by the statute of limitations. *In re Vertrue Inc. Mktg. & Sales Litig.*, 719 F.3d 474, 478 (6th Cir. 2013). The same *de novo* standard applies to "the district court's conclusion that allegations in an amended complaint do not relate back to the original complaint." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 516 (6th Cir. 2007).

**1. The Cutback Claims**

Because ERISA does not provide a statute of limitations for non-fiduciary claims, Plaintiffs' cutback claims are governed by "the most analogous state statute of limitations." *Santino v. Provident Life & Acc. Ins. Co.*, 276 F.3d 772, 776 (6th Cir. 2001). Relying on our decision in *Redmon v. Sud-Chemie Inc. Ret. Plan for Union Emps.*, 547 F.3d 531 (6th Cir. 2008), the district court adopted the five-year limitations period in Kentucky law applicable to statutory claims pursuant to Kentucky Revised Statutes § 413.120(2). On appeal, Plaintiffs concede that their cutback claims accrued on January 1, 2004 and that the limitations period expired in January 2009—more than eleven months before the first amended complaint was filed on December 15, 2009. Plaintiffs argue that the cutback claims are nonetheless timely because they relate back to the whipsaw claims alleged in the original complaint in 2007.[2]

Federal Rule of Civil Procedure 15(c) governs whether newly asserted claims or allegations in an amended pleading relate back to the date of the original pleading with the effect that the new pleading is "timely even though it was filed outside of an applicable statute of limitations." *Krupski v. Costa Crociere S.P.A.*, 560 U.S. 538, 541 (2010). Under 15(c)(1),

---

[2]Plaintiffs also argue for the first time on appeal that they are entitled to tolling under *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974). Incomprehensibly, Plaintiffs criticize the district court for failing to address the issue *sua sponte*, despite their own choice not to invoke *American Pipe* tolling in any of their extensive briefings before the district court on the timeliness of the cutback claims. As a general rule, we do not consider issues that were not raised and passed on below. *Pinney Dock & Transp. Co. v. Penn. Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988). We may nonetheless exercise our discretion to do so in certain exceptional cases, including the so-called *Pinney Dock* exception that applies where the Court determines that an issue is "presented with sufficient clarity and requir[es] no factual development" and reaching the issue "would promote the finality of litigation in this case." *In re Morris*, 260 F.3d 654, 664 (6th Cir. 2001). In this case, we decline to exercise our discretion to reach the *American Pipe* tolling issue raised by Plaintiffs for the first time on appeal. *See id.*

> An amendment of a pleading relates back to the date of the original pleading when . . . (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading.

Fed. R. Civ. P. 15(c)(1)(B). In determining whether the new claims arise from the same "conduct transaction or occurrence," our analysis is guided by "whether the party asserting the statute of limitations defense had been placed on notice that he could be called to answer for the allegations in the amended pleading." *Bledsoe*, 501 F.3d at 516 (citing *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 573 (7th Cir. 2006) ("The criterion of relation back is whether the original complaint gave the defendant enough notice of the nature and scope of the plaintiff's claim that he shouldn't have been surprised by the amplification of the allegations of the original complaint in the amended one.").) This standard is usually met "if there is an identity between the amendment and the original complaint with regard to the general wrong suffered and with regard to the general conduct causing such wrong." *Miller v. Am. Heavy Lift Shipping*, 231 F.3d 242, 250 (6th Cir. 2000).

The cutback claims added by amendment in 2009 do not satisfy the standards of Rule 15(c)(1)(B). The original complaint can be fairly read as challenging only the methodology of Defendants' whipsaw calculation for those Plan participants who have elected or will elect to receive a lump-sum and exit the Plan.[3] The cutback claims, in contrast, challenge the legality of the 2004 Amendment, which changed the rate governing the allocation of interest credits to members' nominal account balances during their continued participation in the Plan. The claims challenged distinct aspects of the Plan's administration—there is no identity with regard to the "general conduct" alleged to cause Plaintiffs' injury. *Miller*, 231 F.3d at 250. The lack of interrelationship between the two claims is illustrated by the fact that Durand's whipsaw claim fully accrued when she received her lump-sum distribution in 2003, before the 2004 Amendment was adopted and took effect. Similarly, Tedesco and others who have not received a lump-sum

---

[3]Plaintiffs attempt to characterize the original complaint as alleging a pattern and practice of benefit reductions in violation of ERISA. *See, e.g.*, *Chesapeake & Ohio Ry. Co. v. U.S. Steel Corp.*, 878 F.2d 686, 691 (3d Cir. 1989) (finding relation back under Rule 15(c) where the original pleading alleged a continuing course of conduct). The original complaint, however, did not allege any practice with broader scope than the application of the wrong projection rate in the whipsaw calculation for those receiving lump-sums.

payout could assert their claims without any reference to the whipsaw calculation. "[A] claim with entirely different 'operative facts' will not relate back." *Id.* at 249.

Relying on *Bledsoe*'s emphasis on notice to the opposing party regarding the scope of the suit, Plaintiffs argue that statements made in a letter sent in the course of settlement negotiations in January 2008 notified Defendants that Plaintiffs contested the legality of the 2004 Amendment's reduction of interest credits. *See Bledsoe*, 501 F.3d at 516-17 (holding that notice satisfying Rule 15 was established by the disclosure form furnished as part of the False Claims Act procedure); *see also Employees Committed for Justice v. Eastman Kodak Co.*, 407 F. Supp. 2d 423, 438-39 (W.D.N.Y. 2005) (relying on contents of the plaintiff's EEOC charge to establish notice to defendants of the likely amplification of claims in the suit). We need not decide whether communications made in the course of settlement may be relied upon to establish notice satisfying Rule 15(c)(1)(B), because the cited passage in the January 2008 letter did not furnish any notice that Plaintiffs intended to assert cutback claims based on the 2004 Amendment. In contrast, in July 2007, Plaintiffs' briefing in opposition to the motion to dismiss stated quite explicitly that the 2004 Amendment was "outside the ambit" of the complaint. (R. 13 at PageID 287.) In these circumstances, Defendants were not fairly put on notice that they would face a challenge to the 2004 Amendment under a different provision of ERISA.

In short, the two claims challenge different plan policies, which were adopted at different times, as illegal under distinct provisions of ERISA. Where the original complaint was solely concerned with the legality of Defendants' whipsaw calculation under §§ 1053(e) and 1055(g), new claims challenging the ongoing allocation of interest credits to the nominal account balances of Plan participants under § 1054(g) do not relate back.

### 2. The Breach of Fiduciary Duty Claims

Plaintiffs argue that their breach of fiduciary duty claims under 29 U.S.C. § 1104(a) related to their cutback claims, and thus are viable even if the cutback claims themselves are time-barred. Briefly stated, Plaintiffs' theory is that by failing to disclose certain information, Defendants deprived Plaintiffs of notice that they had potentially meritorious cutback claims while those claims were still timely. Plaintiffs further argue that because Defendants'

nondisclosure was material so long as the limitations period for the cutback claims remained open, the statute of limitations on the breach of fiduciary duty claims should run from the date the cutback claims became time-barred, *i.e.*, from January 1, 2009, the date the cutback claims lapsed under the borrowed Kentucky statute of limitations. Ky. Rev. Stat. Ann. § 413.120(2) (creating a five-year limitations period for "liability created by statute"); *Redmon*, 547 F.3d at 535-37.

ERISA specifies a three- or six-year limitations period for claims of breach of fiduciary duty. 29 U.S.C. § 1113 (2012). A claim is timely if filed within six years "after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation." Alternatively, an accelerated three-year limitations period is triggered as of "the earliest date on which the plaintiff had actual knowledge of the breach of violation." *Id.* As the Supreme Court recently instructed, in analyzing the timeliness of claims that defendants have breached their fiduciary duties under ERISA, we must consider the "nature of the fiduciary duty." *Tibble v. Edison Intern.*, 135 S. Ct. 1823, 1827 (2015). In this case, the duty at stake is the duty to inform. "The duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439 (6th Cir. 2002) (quotation marks omitted).

On appeal, Plaintiffs identify two instances of nondisclosure that they argue constituted a breach of fiduciary duty. The first is Defendants' failure to inform Plan participants, while their claims were unquestionably timely, that the IG "had formally concluded following an audit of the Plan that [the Company] and the Plan were using an unlawful interest rate substitution methodology to calculate benefits." Pl.'s Br. at 48. The second instance of nondisclosure put forward as a basis for a breach of fiduciary duty claim is that Defendants "never told participants that the purpose of the 2004 amendment . . . was to 'cut[] off whipsaw liability." *Id.* (quoting R. 63, Def.'s Memo, PageID 1169, n.17).

These alleged nondisclosures, however, simply cannot support a breach of fiduciary duty claim related to the lapse of Plaintiffs' cutback claims concerning the 2004 Amendment. It must

be remembered that class members' breach of fiduciary duty claims related to the alleged whipsaw violations remain active in the pending litigation below.  The instances of nondisclosure argued by Plaintiffs before this Court have nothing to do with the breach of fiduciary duty claims that were dismissed from the suit and are at issue in this appeal—the claims related to the allegedly illegal reduction in the interest crediting rate imposed by the 2004 Amendment.

Plaintiffs' first theory of breach plainly does not relate to Plan participants' awareness of their cutback claims.  The IG report that Plaintiffs argue should have been disclosed addressed an entirely distinct aspect of Plan policy (i.e., the projection rate used in the whipsaw calculation) and, moreover, was issued years before the 2004 Amendment was adopted.  Defendants' failure to disclose the IG's findings therefore has no relevance to the lapse of the cutback claims on January 1, 2009.  If Defendants' failure to disclose the findings of that report did constitute a breach of fiduciary duty for other reasons, a question not before us, the Plaintiff class still has every opportunity to press forward with that theory under the whipsaw-related breach of fiduciary claims that remain in the case.  Plaintiffs' second theory fails for similar reasons, as they do not explain how Defendants' disclosure of the alleged purpose of the 2004 Amendment to prevent whipsaw liability would have alerted continuing plan participants to the existence of a cutback claim.

**CONCLUSION**

For the foregoing reasons, we **AFFIRM** the judgment of the district court.