RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0282p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NORFOLK COUNTY RETIREMENT SYSTEM, et al.,

         *Plaintiffs,*

NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM;
TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW
YORK; NEW YORK CITY FIRE DEPARTMENT PENSION
FUND; NEW YORK CITY POLICE PENSION FUND;
TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW
YORK VARIABLE ANNUITY PROGRAM,

         *Plaintiffs-Appellants,*

   *v.*

COMMUNITY HEALTH SYSTEMS, INC.; WAYNE T.
SMITH; W. LARRY CASH,

         *Defendants-Appellees.*

> No. 16-6059

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
Nos. 3:11-cv-00433; 3:11-cv-00451; 3:11-cv-00601—Kevin H. Sharp, District Judge.

Argued: May 3, 2017

Decided and Filed: December 13, 2017

Before: COLE, Chief Judge; SUTTON and KETHLEDGE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Barbara J. Hart, LOWEY DANNENBERG COHEN & HART, P.C., White Plains, New York, for Appellants. Gary A. Orseck, ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP, Washington, D.C., for Appellees. **ON BRIEF:** Barbara J. Hart, David C. Harrison, Scott V. Papp, LOWEY DANNENBERG COHEN & HART, P.C., White Plains, New York, W. Michael Hamilton, PROVOST UMPHREY, LLP, Nashville, Tennessee, for Appellants. Gary A. Orseck, Michael L. Waldman, Matthew M. Madden, Daniel N. Lerman, ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP,

Washington, D.C., Steven A. Riley, Milton S. McGee III, JACOBSON, PLC, Nashville, Tennessee, for Appellees.

———————

**OPINION**

———————

KETHLEDGE, Circuit Judge.  The value of shares in Community Health Systems fell immediately after a competitor, Tenet Healthcare Corporation, publicly disclosed expert analyses and other information suggesting that Community's profits depended largely on Medicare fraud. The plaintiffs here, who owned Community shares at the time, allege that the disclosure caused the fall.  The district court found that theory implausible because the disclosure came in the form of a complaint, which the market would regard as comprising mere allegations rather than truth. But whatever the merits of that proposal as a general rule, the Tenet complaint at least plausibly presents an exception to it.  Moreover, according to the plaintiffs, the market received similar disclosures from another source:  namely Community itself, whose senior executives—after trying for several months to lull the market with still more misrepresentations—eventually corroborated much of what Tenet had alleged.  And when they did, Community's shares fell once again.  The plaintiffs in this case have therefore plausibly alleged that the value of Community's shares fell because of a series of revelations about practices that Community had previously concealed.  For that reason and others, we reverse.

I.

A.

This case comes to us at the pleadings stage, so we take the allegations in the amended complaint as true.  *See Kaminski v. Coulter*, 865 F.3d 339, 344 (6th Cir. 2017).

Community runs the largest for-profit hospital system in the country.  In 2011 alone, its 131 hospitals made $13.6 billion in revenue.  That revenue depended in significant part on Medicare, which reimburses hospitals for treating patients covered by Medicare.  Those reimbursements accounted for about 30% of the revenue made by Community's hospitals from 2006 to 2011.

Medicare reimburses hospitals for inpatient and outpatient emergency services, both of which Community's hospitals offer. Inpatient services are reserved for patients who need more than 24 hours of constant care, so Medicare pays hospitals far more for those patients: in some cases nearly ten times more. But Medicare will reimburse hospitals only for services that are "reasonable and necessary." 42 U.S.C. § 1395y(a)(1)(A). Hospitals are therefore obliged not to classify patients as inpatients when less extensive, outpatient services would suffice; otherwise, hospitals can be held liable for fraud. *See* 31 U.S.C. § 3729.

To determine whether a person needs inpatient or outpatient care, most hospitals use one of two systems: the InterQual Criteria or the Milliman Care Guidelines. Both were developed by independent companies with no financial interest in admitting more inpatients than outpatients. The InterQual Criteria were written by a panel of 1,100 doctors and reference 16,000 medical sources; the Milliman Guidelines were written and reviewed by over 100 doctors and reference 15,000 medical sources. About 3,700 hospitals use InterQual and about 1,000 use Milliman— over 75% of hospitals nationwide.

But Community's hospitals were not among them. Instead those hospitals used a system called the Blue Book, written by Community itself. The Blue Book directed doctors to provide inpatient services for many conditions that other hospitals would treat as outpatient cases under InterQual or Milliman. For example, if a patient comes to the emergency room with chest pain—a vague complaint but apparently one of the most common—outpatient care is the standard. Typically, as described in the amended complaint, the clinician runs "two to three sets of blood tests on the patient every six to eight hours to measure the levels of cardiac enzymes (specifically, a cardiac marker known as troponin) in the blood." Elevated levels of troponin mean that the patient has suffered a heart attack or may suffer one soon. "In addition, it is standard practice to perform two electrocardiograms ('ECGs'), which measure changes in heart rhythm that may be indicative of a heart attack[.]" These tests can easily be completed in less than 24 hours, so "it is standard practice for these patients to be treated in observation, rather than admitted to the hospital." Yet the Blue Book required patients to be admitted first—thus potentially increasing Community's revenue tenfold—and then treated as outpatients only after tests showed they were not at risk. Community's Senior Vice President of Quality and Resource

Management said as much when she explained that Community wanted "no chest patients" treated as outpatients.

Community had the same goal for many other conditions, including syncope (*i.e.*, dizziness or fainting), pneumonia, gastrointestinal bleeding, cellulitis, and atrial fibrillation. In each case, the Blue Book directed Community doctors to admit more inpatients than other hospitals would. And Community made sure those doctors complied. It required that all doctors receive a copy of the Blue Book and work toward a "goal of ZERO Medicare observations" (*i.e.*, treatment as an outpatient). It paid higher bonuses to doctors who admitted more inpatients. It also required hospitals to use "Pro-MED" software—again written by Community itself—to track inpatient versus outpatient admissions and to set quotas for inpatient admissions. And it required hospitals to fire the doctors (sometimes en masse) who did not meet those quotas.

For all this internal focus on the Blue Book, Community never mentioned the Blue Book in public. Rather, it attributed its profits to the "synergies" and "efficiencies" of its hospital network. During a quarterly earnings call on July 27, 2006, for example, Community's CEO, Wayne T. Smith, said the "strong revenue" was thanks to "the strength of our operating model."

Revenues were indeed strong: from 2006 to 2011, Community bought more than 50 hospitals, nearly doubling its size and tripling its revenue. Its major acquisition was Triad Hospitals, Inc. After that acquisition—and after Community directed Triad to switch from InterQual to the Blue Book—Triad's hospitals saw sharp increases in inpatients and sharp declines in outpatients. One Triad hospital nearly eliminated its outpatient numbers in a matter of ten weeks.

Over the years Community heard concerns about the Blue Book, both from within its ranks and from without. In 2007, Community's Chief Medical Officer said that the "Blue Book [was] just not adequate." She echoed the words of Triad's managers, who said that insurers would be skeptical about paying for inpatient services if Triad's hospitals switched from InterQual. Community's internal audits found that its hospitals were improperly classifying many patients as inpatients, and Community's own Medicare consultant told management that the Blue Book put the company at risk of a fraud suit.

Yet Community continued to use the Blue Book into 2011, when it set out to acquire another hospital company, Tenet Healthcare Corporation. Initially, Community's directors sent Tenet's directors an offer to buy Tenet's outstanding shares. When Tenet declined, Community initiated a hostile takeover. Community announced that it would nominate its own slate of directors for Tenet's board, and sought to win the votes of Tenet's shareholders by touting its own "reputation for superior operating performance"—without mentioning the Blue Book as a reason for that performance. Community filed this statement, and others like it, with the SEC.

On April 11, 2011, Tenet sued Community, alleging that those statements were false and misleading. According to Tenet, the statements omitted the real source of Community's profit: namely the Blue Book, which Tenet said directed Community's hospitals essentially to defraud Medicare. The complaint ran for 208 paragraphs, detailing at length how the Blue Book directed doctors to classify patients suffering from various conditions, and how those directions differed from the industry standard. The complaint also described the reports of two healthcare consulting firms that Tenet had hired to compare Community's patient data to that of other hospitals. The firms found that Community treated about 60% fewer patients as outpatients than the national average, and that this discrepancy was not due to the locations or types of patients seen at Community's hospitals. Instead, according to Tenet, the data led "to a single, inescapable conclusion: patients whose medical needs likely required treatment in outpatient observation . . . were systematically admitted for higher-paying inpatient treatment at [Community's] hospitals." This practice, Tenet alleged, "has served to overstate [Community's] growth statistics, revenues, and profits, and has created a substantial undisclosed financial and legal liability[.]" (Community later paid the federal government $98 million to settle multiple suits for Medicare fraud.) Moreover, Tenet alleged, "[b]y failing to disclose its improper business practices and substantial liabilities," Community had "made false and misleading statements and material omissions to its own shareholders."

Later that day, Community issued a press release denying Tenet's allegations as "completely without merit[.]" In a discussion with a Wells Fargo analyst, however, Community's CFO, Larry Cash, conceded the truth of one allegation: that Community's hospitals did in fact use the Blue Book. But Cash claimed that about 30 of Community's

hospitals had already stopped using it, and that the rest would do so by the end of the year—without losing revenue. After those assurances, Wells Fargo maintained its high rating of Community's stock. Yet Community's stock price fell 35% that same day.

In the following weeks, Community made further admissions: that it had received a subpoena "in connection with an investigation of possible improper claims submitted to Medicare"; that it was the defendant in a suit brought by an internal whistleblower, whose allegations were similar to Tenet's; and that in 2010 an investment group had complained privately to Community about its "aggressive and unsustainable" Medicare billing practices. Meanwhile, Community's officers continued to deny Tenet's allegations and sought to mitigate their impact. Smith, the CEO, said in a press release that Tenet's claims were "irresponsible and inaccurate" and that Community's "business practices are appropriate." Cash, the CFO, said at a conference that the Blue Book was "fairly close" to InterQual in guiding inpatient admissions. Community also released a 112-page presentation to support Cash's claim that switching from the Blue Book to a more standard system would not hurt revenues; according to the presentation, the increase in inpatients at Triad's former hospitals had not been due to the Blue Book, but rather to "improved case management" and a "strong flu season."

In response to these tactics, Community's stock price steadied for a time. But the stock began to decline again during the summer of 2011. Eventually Community withdrew its offer to acquire Tenet. Then, on October 26, Community issued a press release that disclosed its earnings from the third quarter of its fiscal year. The release showed that Community's revenues were lower—and that its hospitals had admitted 7% fewer inpatients—than during the same quarter the year before. J.P. Morgan was "surprised" by the decline. Wells Fargo added that, in light of the weaker admission numbers, Tenet's claims "might have more validity than originally thought[.]" On a conference call that same day, Cash admitted to analysts and investors that the losses were related to phasing out the Blue Book; seventy-five percent of the hospitals that had done so had seen a decline in inpatient admissions. Smith admitted on the same call that "there's no question we've had some adverse impact related to issues . . . around the Tenet lawsuit."

The next day, Community's share price fell another 11%. All told, from April 11, 2011 (the day Tenet filed its complaint) to October 27, 2011 (the date after Community's earnings

report and its executives' admissions), Community's shares lost more than half their value—falling from around $40 to just under $18.  The plaintiffs lost a total of $891 million.  Yet Smith and Cash avoided similar losses, having sold many of their Community shares before they began to bring the Blue Book in line with industry standards.  Those sales brought them each over $7 million.

B.

The plaintiffs here are Community shareholders.  Three different shareholders initially filed putative class actions in May and June 2011, each alleging that Community, Smith, and Cash had inflated Community's share price through false and misleading statements.  The district court consolidated the three cases in January 2012, appointed a group of New York pension funds as lead plaintiffs, and allowed the Funds to file a new, consolidated complaint.  In that complaint, the Funds defined the class as persons or entities that held Community shares between July 27, 2006 (when Smith credited Community's revenue to its "operating model" rather than to the Blue Book), and April 8, 2011 (just before the Tenet complaint and the first major drop in Community's share price).  The Funds alleged that the defendants' alleged fraud had caused these shareholders' losses because the losses came as soon as the market learned of the fraud.

The defendants moved to dismiss the Funds' complaint.  Two years later—after a series of recusals by a series of district judges hearing the case, and without a ruling on the motion—the district court allowed the Funds to amend the complaint.  This time the Funds expanded the class to include anyone who had held Community shares until October 26, 2011.  The defendants moved to dismiss this amended complaint as well.

The district court found that the new allegations in the amended complaint—specifically that Community, Smith, and Cash had made misleading statements from April 11 to October 26, when Smith and Cash then made damaging admissions—were untimely.  As to the other allegations, the court found that the Funds had sufficiently pled that the defendants made misleading statements, and that they did so intentionally.  But the court held that the Funds had

not adequately alleged that the misleading statements had caused the Funds' losses. The court therefore dismissed the case.

This appeal followed.

II.

We review both grounds of the district court's decision de novo. *See Durand v. Hanover Ins. Grp., Inc.*, 806 F.3d 367, 374 (6th Cir. 2015) (timeliness); *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir. 2006) (failure to state a claim).

A.

The Funds argue first that the allegations in the amended complaint are timely because any new allegations relate back to those in the original consolidated complaint. The Funds' claims of securities fraud are subject to a two-year statute of limitations, which begins to run (as relevant here) when the plaintiff discovers the alleged fraud. *See Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 653 (2010). No one disputes that the original consolidated complaint was timely: the Funds first discovered the defendants' alleged fraud no earlier than April 2011 (when the Tenet suit was filed), and the Funds filed the consolidated complaint less than two years later, in July 2012. Nor does anyone dispute that, absent some other rule, any new allegations in the amended complaint are untimely: the Funds filed that complaint on October 15, 2015, well over two years after the events at issue here.

But there is some other rule here. Under Federal Rule of Civil Procedure 15(c), otherwise untimely allegations in an amended complaint become timely if they "relate back" to allegations in the initial complaint. Specifically, allegations relate back to the original filing if they "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading[.]" Fed. R. Civ. P. 15(c)(1)(B). As interpreted by our court, this standard is met if the original and amended complaints allege the same "general conduct" and "general wrong." *Durand*, 806 F.3d at 375. For if the original complaint puts a defendant on notice of the plaintiff's general claim, then new allegations that merely build on that claim should come as

no surprise.  *See United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 516-18 (6th Cir. 2007).

That is all that the allegations in the amended complaint did here.  The original complaint alleged that the defendants defrauded investors by concealing the Blue Book's role in padding Community's bottom line, and that the Tenet suit aimed to expose that fraud.  The amended complaint built on that claim by alleging more expressly that, after the Tenet suit was filed, the defendants engaged in a series of lulling misrepresentations that were designed to preserve the fraud's effect.  Those later misrepresentations included, among other things, the falsehood that the Blue Book was "fairly close" to the industry standard in its effect on inpatient admissions.  Eventually the artifice fell away when Community's earnings report for the third quarter of 2011 belied its lulling misrepresentations and Community's own executives admitted that the reason for those disappointing results was—notwithstanding its recent assurances—its discontinuation of the Blue Book procedures.  The lulling misrepresentations thus served the same function as the earlier ones:  to convince investors that Community's revenues were sustainable when in fact they were not.  All of the misrepresentations served the same fraud.

Both the original and amended complaints therefore allege the same "general conduct": namely that the defendants obscured their improper admissions practices both before and after the Tenet complaint.  *Durand*, 806 F.3d at 375.  And both allege the same "general wrong": namely that investors bought and kept Community's artificially inflated shares only to lose their investments when the artifice was revealed.  *Id*.  The allegations in the amended complaint thus relate back to those in the original complaint.  Indeed, most of those allegations were already in the original complaint, which recites the defendants' allegedly misleading responses to Tenet's complaint.  (The district court seemed to overlook those allegations in finding the amended complaint untimely.)  Of course, the amended complaint did expand the class definition to include investors that held their stock until October 2011, rather than until only April 2011.  But that change only conformed the class definition to the scope of the same fraud "set out" in the original complaint.  Fed. R. Civ. P. 15(c)(1)(B).  That should have come as no surprise.  The allegations in the amended complaint were therefore timely.

B.

The Funds next argue that the district court erred in dismissing the amended complaint for failure to state a plausible claim of securities fraud under § 10(b) of the Securities Exchange Act and the SEC's Rule 10b-5. To state a claim under those provisions, the plaintiffs must allege that the defendants made material misrepresentations or omissions in connection with the sale of a security, that they did so with bad intent (*i.e.*, scienter), that the plaintiffs relied on the misrepresentations or omissions, and that they eventually suffered an economic loss as a result. *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 383-84 (6th Cir. 2016).

As to those elements, there is considerable common ground in this appeal. Nobody disputes that the amended complaint plausibly alleges that the defendants made false and misleading statements about the source of their profits, and that they did so with an intent to mislead the market. The latter point is where many securities claims fail, since even in their initial pleadings plaintiffs must set forth allegations that, if proved, establish a "strong inference" of fraudulent intent. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011). Yet here the plaintiffs met that standard, not least because of the remarkable timing of Smith's and Cash's stock sales.

Instead the only element at issue here is causation, *i.e.*, whether the plaintiffs plausibly alleged that "the act or omission of the defendant alleged to violate [the Securities Exchange Act] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). As pleading requirements go, this one is "not meant to impose a great burden upon a plaintiff." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Rather it is meant to prevent disappointed shareholders from filing suit merely because their shares have lost value and then using discovery to determine whether the loss was due to fraud. *Id*. at 347-48. Thus, at the pleading stage, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id*. at 347.

Plainly the loss that the Funds had in mind is the value that their Community shares lost when the market realized that Community's revenues were padded with improper inpatient

admissions. And the "causal connection" they had in mind is that "the market reacted negatively" when those fraudulent practices were revealed. *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 384. Whether the plaintiffs adequately alleged that causal connection is the nub of the issue here. Sometimes defendants reveal their own fraud via a "corrective disclosure," *i.e.*, a statement that reveals what the defendants themselves previously concealed. But such admissions can be hard to come by, and courts have otherwise held that revelations can come from many sources, including whistleblowers, analysts, and newspaper reports. *See FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1311 n.28 (11th Cir. 2011); *see also, e.g., Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) (Wall Street Journal article). Likewise such revelations need not come all at once, but can come in a series of partial disclosures. *See Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 472 (4th Cir. 2011). Of course, for the revelation to cause the plaintiffs' losses, the information must in a practical sense be new; otherwise the market will have processed and reacted to that information already. *See Rand-Heart of N.Y., Inc. v. Dolan*, 812 F.3d 1172, 1180 (8th Cir. 2016). And the plaintiffs must allege more than that they bought the shares at an inflated price, since they could resell at that price and thus not lose anything. *See Dura*, 544 U.S. at 342.

Here, the plaintiffs point primarily to two disclosures in particular: first, the Tenet complaint in April 2011 and Cash's related admission that Community used the Blue Book to guide inpatient admissions; and second, the defendants' October 2011 admissions that earnings were down and that Community's phase-out of the Blue Book played a role in that fall. As proof that these disclosures caused their losses, the Funds point out that Community's share price dropped immediately after the disclosures hit the market—by 35% the day of Tenet's complaint, and by 11% the day after the defendants' October admissions. Moreover, the Funds allege that these disclosures brought new information to the market. According to them, the Tenet complaint revealed exactly what the defendants had for years concealed: that the Blue Book was propping up revenues. And in October the defendants themselves revealed what they had for months denied: that Tenet was right.

Taken together, these disclosures—and the speed at which Community's share price fell after them—make it at least plausible that the disclosures had something to do with the Funds'

losses. *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997). There might have been other causes. But whether the Funds' losses flowed from the disclosures, Community's failed merger with Tenet, or anything else is for the parties to dispute at the summary-judgment stage or at trial, rather than for us to decide on the pleadings here. At this point it suffices to say that the complaint gives the defendants ample indication of the causation theory that the Funds intend to advance. *Dura*, 544 U.S. at 347.

Yet the defendants argue, and the district court held, that Tenet's complaint could not reveal the truth behind their prior alleged misrepresentations because complaints can reveal only allegations rather than truth. Although that proposition might have merit as a general rule, we reject it as a categorical one. As an initial matter, every representation of fact is in a sense an allegation, whether made in a complaint, newspaper report, press release, or under oath in a courtroom. The difference between those representations is that some are more credible than others and thus more likely to be acted upon as truth. Statements made under oath are deemed relatively credible because the speaker typically makes them under penalty of perjury. *See, e.g.*, 18 U.S.C. § 1621. And a defendant's own admissions of wrongdoing are credible because they are statements against interest. *Cf.* Fed. R. Evid. 804(b)(3). Mere allegations in a complaint tend to be less credible for the opposite reason, namely that they are made in seeking money damages or other relief. But these are differences of degree, not kind, and even within each type of representation some are more credible than others. Hence we must evaluate each putative disclosure individually (and in the context of any other disclosures) to determine whether the market could have perceived it as true. *See, e.g.*, *Amedisys*, 769 F.3d at 322-26.

Here, two aspects of the Tenet complaint set it apart from most complaints for purposes of that determination. The first is separate from the complaint itself: Community's CFO, Cash, promptly admitted the truth of one of the complaint's core allegations, namely that Community had used the Blue Book to guide inpatient admissions. Cash's admission was only partial: although it revealed a material fact that Community had been careful to omit in its representations to investors, it did not itself reveal the full extent to which the Blue Book inflated Community's revenues and subjected Community to potential liability. But it is easily plausible that Cash's admission, together with the relevant allegations in the Tenet complaint, revealed a

material fact that Community had previously concealed from the market. This case is thus similar to one where the announcement of an SEC investigation, in addition to an admission by the defendant, amounted to a corrective disclosure. *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209-11 (9th Cir. 2016); *see also Meyer v. Greene*, 710 F.3d 1189, 1201 n.13 (11th Cir. 2013).

Second, the Tenet complaint itself included expert analyses that did describe the extent to which the Blue Book inflated revenues and exposed the company to liability. Specifically, as noted above, two different consulting firms with expertise in the healthcare industry compared Community's inpatient admissions to those of other hospitals, and separately concluded (as Tenet put it) that Community systematically admitted as inpatients "patients whose medical needs likely required treatment" only as outpatients. The latter conclusion in particular—that Community not only admitted more inpatients than other hospitals, but did so in a manner that was clinically improper—was beyond the ken of most investors, and thus revealed new information to them. *See Amedisys*, 769 F.3d at 323; *compare Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 863 (11th Cir. 2015) (investment analyst's report that merely summarized a whistleblower complaint filed months before was not new information). Indeed, that the propriety of Community's inpatient admissions was beyond the ken of most investors is arguably the reason why Community's later attempts (allegedly) to lull them were to some extent successful. And Community offers no reason now (other than the analyses' placement in a complaint) to think that the market regarded the analyses' new information as anything other than credible. It is at least plausible, therefore, that the expert analyses in the Tenet complaint revealed a truth that Community had until then fraudulently concealed: that the Blue Book had improperly inflated Community's inpatient admissions and thus its profits.

Community argues further, however, that neither disclosure—that Community used the Blue Book to guide inpatient admissions, or the expert analyses of the Blue Book's effect—was truly new. Specifically, Community says the Blue Book was copyrighted and thus presumably available for inspection at the Library of Congress. We pass over for now the question whether a document's mere availability at the Library of Congress means, as a matter of law, that the market is presumed to know about its contents. For on the record as it comes to us here, Community's own alleged fraud left investors with no idea that the Blue Book (not to mention

the paraphernalia used to implement it, like Pro-MED) was a device to inflate Community's revenues. Market participants thus had no greater reason to travel to Washington to inspect the Blue Book than they had to inspect, say, Community's articles of incorporation. The reality (at least plausibly), therefore, is that the disclosure that Community used the Blue Book to guide inpatient admissions was news to the market.

Community similarly contends that the expert analyses did not convey new information because the two consulting firms used publicly available admissions data in comparing Community's inpatient admissions to those of other hospitals. In fact only one of the consulting firms used such data; the other used data that was not publicly available. But more to the point, Community overlooks the gravamen of the experts' analyses, which (as discussed above) was not merely that Community inflated its inpatient admissions, but that it did so in ways that were clinically improper. And that quite plausibly came as news to investors.

Finally, Community argues that the Tenet complaint revealed no new information because investors could have read that information in a whistleblower complaint that a Community employee had filed under the False Claims Act. But that complaint alleged fraudulent billing only at the specific Community hospital where that employee worked. It thus remains plausible that the market first learned the full extent of Community's alleged fraud from Tenet's complaint.

The Funds have therefore plausibly alleged corrective disclosures that revealed the defendants' antecedent fraud to the market and that thereby caused the plaintiffs' economic loss. Thus the Funds have stated a claim for securities fraud.

\*        \*        \*

The district court's judgment is reversed, and the case remanded for further proceedings consistent with this opinion.