AGEE, Circuit Judge, dissenting:
According to plaintiff Phillip Singer, defendant TranS1, Inc. (the "Company") and *448 its officers engaged in a years-long pattern of behavior that violated federal securities law. That behavior is alleged to have deceived healthcare providers, the Medicare and Medicaid administrative agencies and violated the False Claims Act, 31 U.S.C. §§ 3729 - 33. Singer now asserts that the Company's alleged actions establish liability to investors under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. §§ 78a - 78qq. Although the district court convincingly found the complaint deficient as a matter of law, the majority agrees with Singer, vacates the judgment of the district court and reinstates Singer's complaint.
I disagree and respectfully dissent. Singer has not pled the necessary elements of either a section 10(b) claim or a section 20(a) claim. I would affirm the district court's judgment dismissing the complaint.[1]
I.
Section 10(b) of the Act prohibits the use of "any manipulative or deceptive device or contrivance" with regard to securities. 15 U.S.C. § 78j(b). The associated regulation provides that section 10(b) prohibits "mak[ing] any untrue statement of a material fact or ... omit[ting] to state a material fact necessary in order to make the statements made [in connection with the sale of a security] not misleading." 17 C.F.R. § 240.10b-5(b).
Expounding on that definition, the Supreme Court has stated that a section 10(b) claim has six elements. A securities fraud plaintiff must plead "(1) a material misrepresentation (or omission); (2) scienter, i.e. , a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance ...; (5) economic loss; and (6) loss causation, i.e. , a causal connection between the material misrepresentation and the loss." Dura Pharm., Inc. v. Broudo , 544 U.S. 336, 341-42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).[2] Primarily at issue in the district court were the first, second, and sixth of these elements. That is: did Singer sufficiently plead that the Company made a material misrepresentation with scienter that also established loss causation? The district court held that Singer had failed to do so with respect to the first and second elements, but had made the requisite showing for loss causation. In my view, Singer fails on all three elements.
II.
We review the grant of a motion to dismiss de novo, applying the traditional Federal Rule of Civil Procedure 12(b)(6) standards. Teachers' Ret. Sys. of La. v. Hunter , 477 F.3d 162, 170 (4th Cir. 2007). The Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.) (the "PSLRA"), also governs our review.
Under Rule 12(b)(6), we determine "whether the complaint states a claim upon which relief can be granted in light of the pleading requirements of Rules 8 and 9, as well as the larger design of the Federal Rules [of Civil Procedure]." Hunter , 477 F.3d at 170. Rule 9, and in particular *449 Rule 9(b), requires that fraud be pled "with particularity." We "accept as true [the complaint's] well-pleaded factual allegations, but owe no allegiance to unwarranted inferences, unreasonable conclusions, or arguments drawn from those facts." Katyle v. Penn Nat'l Gaming, Inc. , 637 F.3d 462, 466 (4th Cir. 2011).
We also apply the PSLRA, which "provides that in pleading a material misrepresentation or omission, ... and the scienter necessary to such a misrepresentation or omission, the plaintiff must plead facts ," Hunter , 477 F.3d at 172, and cannot rely on mere speculation. The "complaint must include each statement alleged to have been misleading, the reason ... why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." Id. ; see also 15 U.S.C. § 78u-4(b)(1). Similarly, "in alleging scienter, the plaintiff must, with respect to each act or omission alleged to violate [section 10(b) ], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Hunter , 477 F.3d at 172 ; 15 U.S.C. § 78u-4(b)(2).
With this background in mind, I turn to the merits of Singer's appeal.
III.
On appeal, the parties again dispute the elements of omission, scienter, and loss causation. A failure to plead any one of those elements in accord with the PSLRA or Rules 8 and 9(b) would doom Singer's case. But Singer's complaint fails under each of the three disputed elements.
A.
First, Singer has failed to plead any actionable misrepresentation or omission. A misrepresentation or omission is actionable if it is factual, false or misleading, and material. See Longman v. Food Lion, Inc. , 197 F.3d 675, 682-83 (4th Cir. 1999). In the abstract an issuer generally has no duty to disclose damaging information. See Basic Inc. v. Levinson , 485 U.S. 224, 239 n.17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). Thus, the omission of damaging information often is not actionable, even if the corporation fails to divulge illegal conduct. See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG , 752 F.3d 173, 184 (2d Cir. 2014) ("[D]isclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." (footnote omitted) ).
That is not an absolute rule, however. For example, if the corporation's silence on a subject "would make other [of its] statements misleading or false," then it must speak. Taylor v. First Union Corp. of S.C. , 857 F.2d 240, 243-44 (4th Cir. 1988) ; accord City of Monroe Emps. Ret. Sys. v. Bridgestone Corp. , 399 F.3d 651, 669 (6th Cir. 2005) ("In order to be actionable, a misrepresentation or omission must pertain to material information that the defendant had a duty to disclose.... A duty to affirmatively disclose may arise when there is insider trading, a statute requiring disclosure, or ... an inaccurate, incomplete or misleading prior disclosure.").
Any misrepresentation or omission also must be material. That is to say, it must be one that a reasonable investor "would consider ... important in deciding whether to buy or sell the security" or a fact that would have "significantly altered" the "total mix of information made available" to the investor. See Longman , 197 F.3d at 683.
*450 1.
The Company made no material misstatement or omission in its various descriptions of its reimbursement practices. To the contrary, the Company was forthcoming about the fact that the American Medical Association ("AMA") had given a "Category III CPT" classification to the AxiaLIF System (the "System") for billing purposes, told investors that Category III CPT codes were unlikely to be reimbursed, and described in detail the steps it was taking to preserve its revenues-including by encouraging the use of a multiple-step coding sequence.
To begin, the Company repeatedly disclosed to investors that the AMA gave the System a Category III CPT code for reimbursement purposes. In a February 2009 conference call with investors, the Company indicated that "a portion of [its] surgeon fee migrated from an unlisted code to a category three CPT ... code[.]" J.A. 1196 ¶ 69. The Company further stated that the Category III code may create some difficulty in obtaining reimbursements, but that any difficulty would be no more than that experienced before the System received any tracking code. See J.A. 1196 ¶ 69 ("[W]e do not anticipate that [the Category III CPT reimbursement code] will create any significant additional headwind with regards to adoption.... [W]e feel that [the] unlisted code gave us about a 5% kind of a headwind and it's probably consistent again this year."). Finally, the Company revealed in a Form 10-K filed with the Securities and Exchange Commission ("SEC") in March 2009 that "some payors ... may not reimburse" Category III CPT codes. J.A. 1197 ¶ 71.
The Company also disclosed that it was encouraging surgeons to use a multiple-step coding sequence to obtain reimbursement. In the March 2009 Form 10-K, the Company stated "[the Category III CPT code] is only one of up to ten different CPT codes physicians may submit to capture the entirety of a spinal fusion procedure lessening the impact should payment for our code be initially denied." J.A. 1197 ¶ 71 (emphasis added). And on an investor conference call in April 2009, the Company described in detail how it was teaching surgeons to use its multiple-step coding procedure:
We have an 800 number and call-in resource center, up and running to assist surgeons with reimbursement issues that may arise.
We have also added two additional reimbursement specialists in the field to work with our surgeon customers and their billing specialists, to help them determine the appropriate coding for the fusion procedures they are performing.
As a strong case volume this quarter would suggest, we have not seen a drop off in procedure volumes as a result of the current weak economic conditions. Having said that, we have begun to see some insurance companies raising the bar on whether to pay for fusion surgery in general or asking more patients to get a second opinion, before agreeing to cover the procedure.
[W]e had the category-three code put in place in January and that was a change in coding. We have actually put out a coding guide now, which has been blessed by everyone. And coding fusions is fairly complex and what we saw initially with the category-three code was right away a lot of coders in the practice went to the concern that like the Charité disc they are just not going to get paid .
The reality is, as we've discussed in the past, this access code is one of several codes that they employ during a typical fusion. So I would say our coding issues have been grassfires, not forest fires, and so, this flare is up. A coder *451 becomes concerned, because they see a category-three code. And we either work through the rep, or we work through the hotline, or now we've actually, as I have mentioned, brought on a couple of field related personnel, who had worked by the way at Saint Francis Medical, where they knew category-three code inside and out. Those people are then, if needed, deployed and we put these fires out.
I don't think we've had many instances, if any, where we just have surgeons stop doing this, but often times there is a concern when they see the category-three code . We need to work with them and once they understand the coding sequence, based on the particular operation that the surgeon does, we move through the process. So, that's why we proactively hired these folks.
J.A. 1198-99 ¶ 74 (emphases added).
The Company's statements in 2009 laid out each aspect of the Company's reimbursement practices. As the district court observed, "[u]nless [Singer] is contending that the [Company] needed to disclose each and every aspect of [its] reimbursement practices, down to the most minute detail, [I do] not see how [the Company] failed to sufficiently disclose ... [those] practices." J.A. 1348. In sum, "[n]o further disclosure was required because the [Company's] statements were" truthful and accurate in the main and were "not misleading under the circumstances [in which] they were made." J.A. 1348.
2.
Nevertheless, the majority holds that the Company's failure to disclose its "scheme to encourage surgeons to employ CPT codes meant for anterior and other non-Category III procedures in direct disregard of the AMA's mandated Category III code for the System" is an actionable omission for section 10(b) purposes. Majority Op. 433. They conclude that the Company "cho[se] to speak about its reimbursement practices," and thus "possessed a duty to disclose its alleged illegal conduct." Majority Op. 442-43.
The majority faults the Company for "misrepresent[ing] the assistance and training it was providing to surgeons as being wholly for the attainment of 'appropriate'-i.e., legal-reimbursements for the System." Majority Op. 439. But the majority's narrow focus on "appropriate reimbursement" ignores reality. Statements made on the Company's April 2009 investor conference call, for example, acknowledge that the System's Category III CPT code could result in disallowed coverages and describe the steps taken by the Company to improve prospects for reimbursement, including the use of a hotline and field representatives to walk surgeons through coding the procedure. In addition, the Company told investors it was encouraging surgeons to use multiple CPT codes, saying the Category III CPT code was "one of up to ten different CPT codes " that surgeons could use to obtain reimbursement. J.A. 1197 ¶ 71 (emphasis added).
The majority also faults the Company for suggesting that the System's Category III CPT code was "not an experimental code," but rather was a "tracking code." Majority Op. 433, 439. The majority's focus on the Company's use of the phrase "tracking code" ignores the context in which that word was used. Although the Company called the Category III CPT code a "tracking code," it also was clear that such code was not a generally reimbursable Category I CPT code. And the Company's investors knew that the System had been given a Category III code, which is generally not reimbursable, from the Company's multiple disclosures.
*452 More generally, the majority's analysis errs in its central assumption that the Company, if speaking about its reimbursement practices at all, not only had to characterize those practices fairly, but also had to further describe them as fraudulent or illegal. When the Company settled a related False Claims Act lawsuit with the United States, nowhere did the settlement agreement "indicate that using multiple codes, in and of itself, [was] inappropriate." J.A. 1352. Neither Singer nor the majority cites to a statute, regulation, or case that establishes this practice to be either illegal or fraudulent. Nevertheless, the majority's holding creates an inflexible rule that requires a publicly traded corporation engaged in ambiguous activity to represent its behavior as illegal or else risk being the subject of a securities fraud lawsuit. Neither section 10(b) nor the PSLRA requires that result and the majority cites no case for such a rule. See Taylor , 857 F.2d at 243-44 ("Rule 10b-5 imposes ... a duty to disclose only when silence would make other statements misleading or false.").
3.
Other aspects of the majority opinion warrant closer scrutiny. For instance, it obliquely concludes that the Company made a material omission, claiming that, if the Company had informed the market that its reimbursement mechanism was illegal, such disclosure would have changed the "total mix of information" available to investors. Majority Op. 443. Yet, the majority is unable to fully describe how an additional disclosure by the Company would have altered that total mix of information. Its inability is unsurprising for two reasons. First, Singer has failed to allege materiality with the required specificity. That is to say, Singer has not demonstrated under Rule 9(b) and the PSLRA that additional information would have changed the total mix of information available to investors.
Second, and more importantly, the majority cannot identify any additional information that the Company could have disclosed. As the district court correctly noted, the Company disclosed "its reimbursement practices to the public in conference calls and public filings," where it acknowledged that the System "had received a Category III CPT code designation," it "had set up an 800 number and call-in resource center to help surgeons with billing," it "had reimbursement specialists in the field to work with its surgeons," and it "had published a coding guide." J.A. 1347. In view of these numerous, accurate disclosures, the majority errs in concluding that the Company omitted any material information from its disclosures.
* * * *
At bottom, as the district court correctly noted, there was no need for the Company "to disclose each and every aspect of [its] reimbursement practices, down to the most minute detail." J.A. 1348. What the Company did disclose was sufficient to avoid section 10(b) liability-a result that is bolstered, in part, by Singer's failure to plead what was missing. I agree with the district court that Singer fails to adequately plead the required element of a material misrepresentation or omission and I would dismiss the complaint for that reason.
B.
Even if Singer adequately pled a material misrepresentation or omission, he has not sufficiently alleged the element of scienter. Certainly, Singer has alleged that the Company's officers knew the mechanics of the Company's reimbursement practices. Yet, he has not provided material factual allegations from which it could be *453 reasonably inferred that the Company's officers knew those practices violated any fraud statute, whether related to healthcare or otherwise.
Scienter is "a mental state embracing [the] intent to deceive, manipulate, or defraud." Zak v. Chelsea Therapeutics Int'l, Ltd. , 780 F.3d 597, 606 (4th Cir. 2015). To survive a motion to dismiss, the complaint must allege sufficient facts that, when "taken collectively, give rise to a strong inference of scienter." Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP , 551 F.3d 305, 312 (4th Cir. 2009). That "strong inference" must be "at least as compelling as" any other reasonable inference. Id.
Typically, a plaintiff pleads scienter through allegations of intentional misconduct. But he may also plead scienter through allegations of "severe recklessness"-"a slightly lesser species of intentional misconduct." Ottmann v. Hanger Orthopedic Grp., Inc. , 353 F.3d 338, 343-44 (4th Cir. 2003). The severe recklessness standard "comports with the observation of the Supreme Court that the words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was intended to proscribe knowing or intentional misconduct." Id. at 344. See generally 15 U.S.C. § 78j(b) (prohibiting the "use ... in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of [regulations promulgated by the SEC]" (emphasis added) ). A "severely reckless" act is one that is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Ottmann , 353 F.3d at 343.
1.
The allegations in the complaint, taken as a whole, do not plausibly suggest-much less strongly so-that the Company or its officers acted with the requisite intent to deceive. To the contrary, the complaint details a series of frequent and accurate disclosures, from which the strong inference can be drawn that the Company endeavored to tell the truth.
Importantly, the complaint "fails to allege that the defendants knew the [Company's reimbursement] practices were illegal." J.A. 1354. Instead, as the district court correctly understood the complaint, Singer alleges only that the Company's officers "knew about or recklessly disregarded[ ] practices to encourage surgeons to illegally dupe insurance companies." J.A. 1349. But Singer's allegations "are merely conclusory and are unsupported by any specific allegations." J.A. 1349. Thus, without supporting factual matter, Singer's complaint is without merit under the strictures of Rule 9(b) and the PSLRA.
Just as damning, the complaint is bereft of evidence that the Company "encourage[d] [the] omission of the Category III CPT Code." J.A. 1355. Singer's best evidence is an allegation that the Company instructed surgeons to "bury the [code] in the bottom part of the reimbursement request so that insurance companies might overlook it," J.A. 1189 ¶ 51, but he fails to allege any act by the Company to encourage those surgeons to delete or falsify a Category III code.
To be sure, the Company offered surgeons use of a coding guide that "direct[ed] [them] to use [multiple] codes to secure reimbursements." J.A. 1185 ¶ 35. However, the coding guide clearly indicated *454 "that [the System] had received a Category III code." J.A. 1355. Moreover, investors were already aware that the Company was instructing surgeons to use a multiple-step coding sequence to help them secure the maximum potential reimbursement. Nowhere does the complaint "allege that such a practice was improper." J.A. 1352. In addition, the Company was forthright about potential adverse consequences of its reimbursement strategy, as it disclosed to investors "the increased risk of regulatory scrutiny and litigation" in its Form 10-K. J.A. 1348. Such disclosures are inconsistent with any inference that the Company was trying to hide the alleged illegality of its reimbursement practices.
It is unsurprising that the complaint "does not allege that the defendants knew that using multiple codes was inappropriate." J.A. 1352. Not even the Company's settlement agreement with the Government "indicate[s] that using multiple codes, in and of itself," is prohibited. J.A. 1352. And, as already noted, neither Singer nor the majority cites to a statute, regulation, or case that establishes that the multiple-step coding process was illegal or fraudulent. But even if the complaint had made such allegations, the Company fully disclosed the specifics of its reimbursement scheme, as discussed above.
Like the district court, I "do[ ] not see how the defendants failed to sufficiently disclose [the Company's] reimbursement practices." J.A. 1348. The complaint "shows (1) that the defendants openly admitted that [the System] had received a Category III CPT code, (2) that the [coding] guide noted that [the System] had received the Category III code, and (3) that the defendants did not encourage omission of the Category III CPT code." J.A. 1354-55. Singer cannot show scienter under these circumstances.
2.
Nonetheless, the majority concludes that the Company acted with scienter because it responded to the Category III CPT code assigned to the System "with a mix of legal and illegal strategies." Majority Op. 443. Further, the majority finds that the Company selectively downplayed its illegal strategies in communications with investors. It also holds that the Company and its officers knew the Company's conduct was illegal because "the illegality of the fraudulent reimbursement scheme was obvious." Majority Op. 443. But the majority puts too much stock in the "obvious" illegality of the alleged scheme. Majority Op. 443.
It incorrectly assumes that, because the Company's reimbursement framework was allegedly illegal, the Company axiomatically intended to defraud its investors. That premise is not supported by statute or precedent. Even if it were fair to infer that the Company's officers were aware that the Company's reimbursement scheme was illegal, it is unfair to carry that inference one step further and conclude that because the Company acted illegally it therefore also intended to deceive its investors. See Maguire Fin., LP v. PowerSecure Int'l, Inc. , 876 F.3d 541, 547-48 (4th Cir. 2017) ("First, an inference that Hinton may have known his statement was false does not alone satisfy the scienter requirement."). By concluding otherwise, the majority has effectively "read the scienter element out of the analysis in contravention of the PSLRA's exacting pleading standard." Id. at 548. Under the majority's reasoning, an illegal action on the part of a publicly traded company automatically qualifies as fraud on investors for securities law purposes if its conduct was "clearly illegal." Majority Op. 444. That is simply not the law. See City of Pontiac , 752 F.3d at 184 *455 ("[D]isclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." (footnote omitted) ). Just because a plaintiff alleges an illegal act does not mean he has also pled fraud.
Nor is the majority's analysis a correct application of the recklessness standard. Even assuming that the Company may have been reckless about the legality of its conduct, it doesn't follow that the Company also acted recklessly with regard to its conduct as to investors. The Company's description of the alleged scheme was in the main forthcoming and accurate, touching on each component of the alleged reimbursement scheme, discussing its reimbursement practices in detail, and explaining why those practices were used. E.g. , J.A. 1196 ¶ 69; J.A. 1198 ¶ 74.[3]
* * * *
I agree with the district court and would dismiss the complaint for failure to adequately plead the required element of scienter. The complaint contains no plausible allegations to support the required "strong inference" that the Company and its officers knew, or even suspected, that their conduct was illegal. It fails to address the individual officers' knowledge of the illegality of the Company's reimbursement practices. At best, Singer alleges only that the Company and its officers knew or recklessly disregarded practices to encourage surgeons to make it harder for insurance companies to process claims. The district court correctly dismissed Singer's complaint regarding the element of scienter.
C.
Even assuming that Singer adequately pleaded the elements of omission and scienter, his complaint fails to plead loss causation with "sufficient specificity." Katyle , 637 F.3d at 471. The district court initially dismissed Singer's complaint because it failed to plead loss causation with the required specificity, but upon reconsideration changed its view. The district court was right the first time.
"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Lentell v. Merrill Lynch & Co. , 396 F.3d 161, 172 (2d Cir. 2005) ; accord Gasner v. Bd. of Supervisors , 103 F.3d 351, 360 (4th Cir. 1996) ("In a suit brought under Rule 10b-5, the plaintiff must show ... loss causation-that the misrepresentations or omissions caused the economic harm...."). In other words, there must be allegations of "facts to show ... that the misrepresentation or omission was one substantial cause of the investment's decline in value." Katyle , 637 F.3d at 472.
Loss causation is typically pled in one of two ways. One such form is "corrective disclosure" of the alleged fraud, see id. at 472-73, by which a plaintiff establishes loss causation by alleging a "corrective disclosure ... [that] reveal[s] to the market the falsity of the prior" statements, Lentell , 396 F.3d at 175 n.4.
The second method of alleging this element is known as "materialization of the concealed risk." See Katyle , 637 F.3d at 477 & n.10. Under this theory, a plaintiff pleads loss causation "by showing that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."
*456 New Orleans Emps.' Ret. Sys. v. Omnicom Grp., Inc. (In re Omnicom Grp., Inc. Sec. Litig. ), 597 F.3d 501, 513 (2d Cir. 2010). So long as "the risk that caused the loss was within the zone of risk concealed by the misrepresentation[ ]," id. ,"the plaintiff [does] not need to identify a public disclosure that correct[s a] previous, misleading disclosure," Hunter , 477 F.3d at 187 n.3. Once the risk materializes, "the news of the materialized risk would itself be the revelation of fraud that caused [the] plaintiff['s] loss." Id.[4]
Both theories of loss causation drive at the same point: did "the misstatement or omission conceal[ ] something from the market that, when disclosed, negatively affected the value of the security"? Lentell , 396 F.3d at 173 ; accord Schleicher v. Wendt , 618 F.3d 679, 683-84 (7th Cir. 2010). The Seventh Circuit has provided a useful example to illustrate the commonality between the theories:
If a firm that is losing money says "we expect to lose $100 million next quarter" when the managers actually expect the loss to be $200 million, that statement will keep the price higher than it ought to be, and when the next quarterly results show the real $200 million loss the price will adjust.... The parties are wont to call the bad outcome (the $200 million loss) a "materialization of the risk" that the loss would exceed $100 million. But it should be clear that this is just a mirror image of the situation for the same figures in black ink, rather than red. If the firm projects a $200 million profit, when the managers actually expect $100 million, then the eventual disclosure of the expected result could be called a "materialization of the risk" that the real profit would be less than the managers' optimistic number of $200 million.
Schleicher , 618 F.3d at 683-84. Because of their common end point, it follows that materialization of the concealed risk is simply an alternate way of framing the same causation principle embodied by corrective disclosure. Id. ; Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc. , 877 F.3d 687, 695-96 (6th Cir. 2017) (observing that true corrective disclosures "can be hard to come by, and courts have otherwise held that revelations can come from many sources, including whistleblowers, analysts, and newspaper reports").
1.
In a securities fraud case, "the fraud lies in an intentionally false or misleading statement, and the loss is realized when the truth turns out to be worse than the statement implied." Schleicher , 618 F.3d at 684. For example, in Katyle -a corrective disclosure case-this Court hypothesized that damaging, fact-based disclosures such as canceled meetings, express investor doubts, and lack of regulatory approval could meet the section 10(b) pleading standard, depending on the context. 637 F.3d at 469. The Court then observed that, in the light most favorable to the plaintiff, such disclosures could have "alerted investors to the ever-mounting risk that the deal [at the heart of the suit] was unlikely to close." Id. at 477.
*457 Here, the critical allegations in the complaint reveal disclosures to the market from two different sources: (1) an October 17, 2011, Form 8-K-which the Company filed with the SEC-that disclosed the existence of a subpoena received from the U.S. Department of Health and Human Services ("DHHS"), and (2) an analyst's report discussing the subpoena, which was published a day later. But neither source meets the requirement of pleading loss causation, which necessitates specific, fact-based allegations. The Company's Form 8-K disclosure and the analyst's report here do not rise to the relevant level as the examples posited in Katyle reflect.
a.
The analyst's report does not contain plausible factual allegations sufficient to meet the required pleading standard. See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc. , 591 F.3d 250, 255 (4th Cir. 2009) ("Ultimately, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."). The portion of the analyst's report recited in the complaint provides in full:
Management mentioned in our conversation that they have "let so many reps go in the last year and a half" (due to downsizing), which makes us think the subpoena could perhaps stem from allegations by a disgruntled former employee. Another speculation would be since about half of [the Company's] revenues come from physicians still using the [Category I CPT] code (which provides reimbursement), rather than the designated [Category III CPT] code (which does not provide reimbursement), the issue could be due to reimbursement communications, although we think that the Company has been making strong efforts to educate physicians about correct coding. Note that ultimately the decision regarding which code to use lies in the hands of the physician.
J.A. 1210 ¶ 109.
The primary revelation-that the Company had received a DHHS subpoena-is not actionable because it discloses only the fact of a DHHS investigation. Typically, the disclosure of an investigation, "without more, is insufficient to constitute a[n] [actionable] disclosure for purposes of § 10(b)." Meyer v. Greene , 710 F.3d 1189, 1201 (11th Cir. 2013) (applying this principle to commencement of a government investigation); accord Loos v. Immersion Corp. , 762 F.3d 880, 890 (9th Cir. 2014) (holding the same for an internal investigation). The possibility that some unspecified negative information may eventually come to light as a result of the investigation is not the same thing as the possibility that information about fraud will also be reflected. After all, fraud is but one of a panoply of reasons that a given company could be under investigation. Drawing anything more from the report is simply conjecture. For that reason, disclosure of the fact of the DHHS investigation itself is not actionable.
Putting aside the disclosure of the investigation, the analyst's report does not otherwise meet the loss causation element because it does not tie the decline in value of the Company's stock to the alleged fraud. See Lentell , 396 F.3d at 173 ("[T]o establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered[.]").
Singer has not alleged facts from which it reasonably could be inferred that the Company's allegedly fraudulent billing practices caused his injury. The analyst's report does not detail, describe, or discuss how , or even if , the Company violated the "federal healthcare fraud and false claims *458 statutes." J.A. 1210 ¶ 108. The analyst's report states only that the subpoena potentially concerned the Company's billing "communications," but called that hypothesis "speculation." J.A. 1210 ¶ 109. Because the analyst's report itself calls its conclusion speculative, it is remarkable that the majority concludes otherwise.
Indeed, the report offers several facts that just as likely reflect non-fraudulent activity. For example, the report reveals "the Company has been making strong efforts to educate physicians about correct coding." J.A. 1210 ¶ 109. To be sure, the report does suggest that "about half" of the Company's revenues come from surgeons using the Category I code. J.A. 1210 ¶ 109. But when considered alongside the analyst's report's discussion of the Company's "strong efforts" to educate surgeons about "correct coding," the report just as plausibly suggests that the Company directed physicians away from using the Category I CPT code.
b.
The same problems affect the Company's Form 8-K disclosure. There, the Company revealed that it had "received a subpoena" from DHHS, which "s[ought] documents for the period January 1, 2008 through October 6, 2011." J.A. 1210 ¶ 108. This bare-bones revelation may have given the market a reason to speculate, but it does not establish loss causation. It neither corrects a prior statement nor conceals a later-materialized risk. Instead, the Form 8-K discloses only that the Company was under investigation. And "without more, [that fact] is insufficient to constitute a[n] [actionable] disclosure for purposes of § 10(b)." Meyer , 710 F.3d at 1201.
2.
The majority examines the same allegations, but reaches a different conclusion. Their error is in relying on the complaint's speculative allegations as opposed to the sort of plausible factual allegations that our sister circuits have required. For example, in Sparling v. Daou (In re Daou Sys., Inc. ), 411 F.3d 1006 (9th Cir. 2005), a case cited by Singer, the Ninth Circuit held that the plaintiff had adequately pled loss causation when the defendants "began to reveal [financial information that showed] the company's true [and lackluster] financial condition." Id. at 1026. Likewise, in Hubbard v. BankAtlantic Bancorp, Inc. , 688 F.3d 713 (11th Cir. 2012), the Eleventh Circuit concluded the plaintiff had sufficiently pled loss causation when the defendant, an investment company, revealed to the market the weak contents of its commercial real estate portfolio. Id. at 727-28. And in Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corp. , 830 F.3d 376 (6th Cir. 2016), the Sixth Circuit concluded that allegations of a financial disclosure that reported a $2 billion loss sufficiently pled loss causation. Id. at 381-82, 388. Factual allegations of that quality are simply absent here.
* * * *
In sum, Singer's section 10(b) claim fails because he has pled no "revelation of the truth." In re Vivendi, S.A. Sec. Litig. , 838 F.3d 223, 261 (2d Cir. 2016) ; see also Dura Pharm., Inc. , 544 U.S. at 342, 125 S.Ct. 1627 (noting that loss causation requires the "relevant truth ... to leak out"). There is an insufficient nexus to connect any loss in the value of the Company's stock with the discovery that the truth was worse than the Company implied. Neither the Form 8-K disclosure nor the analyst's report, the only evidence proffered, confirm any such "relevant truth." Dura Pharm., Inc. , 544 U.S. at 342, 125 S.Ct. 1627. Instead, the Form 8-K suggested, and the *459 analyst's report speculated, only that the Company was involved in a government investigation. Such speculative allegations as part of a complaint are not enough to survive a motion to dismiss because the loss causation element is not adequately pled. See Nemet Chevrolet, Ltd. , 591 F.3d at 259 (observing that speculation is not enough to survive a motion to dismiss); see also Vitol, S.A. v. Primerose Shipping Co. , 708 F.3d 527, 543 (4th Cir. 2013) (stating that allegations in the complaint must allege "more than the mere possibility of misconduct"). I therefore conclude the district court erred in finding a sufficient pleading of loss causation, which, in and of itself, requires dismissal of Singer's complaint because he failed to adequately plead a required element of the cause of action.
IV.
The majority's holding impermissibly expands the scope of liability under section 10(b) and elides our Rule 12(b)(6) and PSLRA jurisprudence. Singer will be allowed to go on to discovery-and to tax the district court and defendants' valuable time and resources-despite his failure to show loss causation related to a decline in the Company's stock price that was caused by a false statement or omission made with scienter. That is error.
For the reasons discussed above, I conclude that Singer has failed to properly plead the elements of material misrepresentation or omission, scienter, and loss causation as required by Rule 8 and 9(b), as well as the PSLRA. Any one of those failures undermines his claim, and here Singer flunks all three. I would thus affirm the judgment of the district court dismissing this case on the scienter and misrepresentation or omission arguments, and reverse on its finding that loss causation was adequately pled. Because the majority reaches a different conclusion, I respectfully dissent.

Singer's section 20(a) claim against the Company's officers fails because liability under section 20(a) is derivative of liability under section 10(b). Yates v. Mun. Mortg. & Equity, LLC , 744 F.3d 874, 894 n.8 (4th Cir. 2014). I therefore discuss only Singer's section 10(b) claim.

I have omitted internal quotation marks, alterations, and citations here and throughout this dissent, unless otherwise noted.

While Singer may have expected that the Company would rely only on legal reimbursement practices, "an investor's view of a statement is not itself evidence of the speaker's state of mind." Maguire , 876 F.3d at 548.

This Court has neither explicitly adopted nor applied the materialization of the concealed risk theory of loss causation. And it does not do so here. Rather, we have "acknowledged the possibility" that the materialization of the concealed risk theory is viable. See Hunter , 477 F.3d at 187 n.3. Significantly, the majority neither adopts nor applies the materialization of the concealed risk theory here. They instead focus on an "amalgam" of the two loss causation theories. Majority Op. 445-47.
While the materialization of the concealed risk theory may be deemed at some point too vague to withstand scrutiny, for purposes of this case I assume the majority's amalgam paradigm is feasible and address the end result.